**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **ROBERT A. KALIEBE,** ) | |
| ) | **No. 02 C 8934** |
| **Plaintiff,** ) | |
| ) | **HONORABLE DAVID H. COAR** |
| v. ) | |
| ) | |
| **PARMALAT USA CORPORATION d/b/a** ) | |
| **PARMALAT BAKERY GROUP,** ) | |
| **MOTHER'S CAKE & COOKIE** ) | |
| **COMPANY, METZ BAKING COMPANY,** ) | |
| **AND METZ-MOTHER'S CAKE AND** ) | |
| **COOKIE COMPANY CONSOLIDATED** ) | |
| **PENSION PLAN** ) | |
| **Defendants.** ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff Robert Kaliebe ("Plaintiff" or "Kaliebe") filed a three count complaint against

Defendants Metz Baking Company ("Metz"), Metz-Mother's Cake & Cookie Consolidated

Pension Plan ("Plan"), Mother's Cake and Cookie Company ("Mother's") and Parmalat USA

Corporation d/b/a/ Parmalat Bakery Group ("Parmalat") in this Court in December 2002. On

September 30, 2004, this Court granted Plaintiff's voluntary motion to dismiss Parmalat. Count

III of the complaint has also been dismissed.[1]

Two counts remain before this Court: requests for summary judgment motions on both

counts are the subject of this order. Count I presents a claim for recovery of improperly denied

benefits due to Plaintiff under the Metz-Mother's Pension Plan pursuant to Section 502(a)(1)(B)

---

[1]On September 29, 2003, this Court dismissed Count III of the Complaint as to Metz. *See Kaliebe v. Parmalat*, No. 02 C 8934, Opinion of Sept. 29, 2003 (slip op.). On September 30, 2004, this Court dismissed Count III of the Complaint as to the remaining defendants. *See Kaliebe v. Parmalat*, No. 02 C 8934, Order of Sept. 30, 2003.

of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132(a)(1)(B). Count II asserts that defendants are estopped and barred by laches from denying the obligation to pay Plaintiff monthly pension benefits of no less than $3,166.00 and seeks equitable relief pursuant to Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3).

Currently before this Court are three pending motions for summary judgment: one brought by Plaintiff against the Plan, one brought by Metz, and one brought collectively by the Mother's Cake and Cookie Co. and the Plan (referred to collectively as "The Plan Defendants").[2] Plaintiff's motion for summary judgment is DENIED. Metz's motion for summary judgment is GRANTED in part and DENIED in part. The Plan Defendants' motion for summary judgment is GRANTED in part and DENIED in part.

## FACTUAL AND PROCEDURAL BACKGROUND[3]

In May 1964, Plaintiff began working for the New Process Baking Company ("New Process"). New Process instituted a pension plan for its employees, including Plaintiff,

---

[2] Plaintiff has also filed a motion to strike the affidavit of Greg W. Renz that the Metz-Mother's Plan Defendants submitted in support of their motion for summary judgment. This motion is DENIED. Renz was Metz's legal counsel on employee benefits from December 1988 until 1999. From September 2001 until at least the date his affidavit was taken, Renz served as legal counsel on employee benefits for the Parmalat Bakery Group, including Mother's Cake & Cookie Co.
This Court will take into account that portion of Renz's testimony concerning how the pension plan at issue was implemented, but not that portion which refers to how the plan was interpreted. Consequently, Plaintiff's objections to the exhibits proffered by Renz–documents outlining how the plan in its various iterations was to be implemented–are overruled.

[3] The facts in this opinion are taken from the Local Rule 56 statements of the parties, where appropriate. Submissions by the parties that are in violation of this Court's standing order regarding Rule 56 statements and not otherwise present in the parties' memoranda may be disregarded. This Court recognizes that the Plan Defendants adopt the summary of facts portion of the Metz Defendant's summary judgment brief.

sometime in 1985.  According to the terms of the Plan, employees were entitled to monthly pension benefits of $10.00 for each year of service.

The same year that it instituted the plan, New Process was acquired by Heileman Baking Company ("Heileman").  Heileman merged the New Process Plan into the Heileman Plan, but calculated the pension benefits of former New Process employees according to a less generous formula than it used to calculate the pension benefits of employees who pre-merger had worked for Heileman.  According to Sec. 4.06 of the Heileman Plan, employees who had worked for New Process prior to the merger were given a $12.00 monthly benefit for each year of service with New Process prior to 1986 and were given a benefit according to the Heileman benefit formula for each year of service after 1985.

After the acquisition, Plaintiff immediately transitioned to working for Heileman. Plaintiff was not a Heileman employee for long however, as Heileman's bakery assets were then acquired by either Metz or a foreign company owned by Metz (the pleadings are unclear) in 1988.  The Metz Baking Company Pension Plan for Non-Union Employees, as amended and restated effective December 31, 1989, retained the two-step formula for New Process employees in Section 3.01(d).  The Metz Plan also included a specific provision for calculating the pension benefits of employees who had accrued benefits as of December 31, 1989, under a portion labeled Schedule A.  Immediately after the acquisition, Plaintiff began working for Metz. Plaintiff appeared on Schedule A.

Sometime in late 1988 or early 1989, Metz sent Plaintiff a personalized employee benefits statement that stated that the "monthly pension benefit" Plaintiff had accrued as of January 1, 1988 was $444.29.  Plaintiff received another personalized statement from Metz in

3

1990, which stated that his monthly accrued benefit according to the new Metz Pension Plan was $637.93. Before sending out the 1990 statements, Roger Smith, Director of Benefits at Metz, noticed that Mercer, the company hired to prepare benefit statements, had incorrectly calculated the benefits for the employees who had worked at the New Process plant because it had not applied the two-step formula used for former New Process employees. Smith corrected the problem.

In 1991, Plaintiff received a personalized statement indicating that his accrued monthly benefit as of December 31, 1990 was $3,067.00. The 1991 personalized statement did not specifically explain why there was such a dramatic increase in Plaintiff's benefits from the amount stated on his 1990 statement. The statement was accompanied by a letter which stated that Metz had revised its Plan retroactive to December 31, 1989 and that "[a]lthough those revisions have resulted in a new Pension Plan formula, you are assured of a benefit which equals or exceeds the benefit already earned under the old Pension Plan."

The parties disagree as to Plaintiff's next steps. Plaintiff claims that he called Smith to verify that the accrued benefit amount of $3,067.00 was the correct amount. Plaintiff claims that he spoke to Smith for approximately five to ten minutes, during which time Smith verified that the amount was correct. Plaintiff also points to testimony from Smith that he did remember talking on the phone with Plaintiff at some point, but did not remember the nature of the conversation.

Defendants argue that it is unlikely that Plaintiff actually called Smith. Defendants claim that Smith's regular practice when Metz Plan participants questioned the accuracy of a benefits statement was to reassess the data that was used to calculate the benefit. Defendants claim that

Smith's process took a couple of weeks and that he would not verify the accuracy of information in the context of a telephone call.

Defendants also claim that the 1991 mistaken benefit estimate was corrected in a January 9, 1992 letter to Plaintiff from the then Plan Administrator, Cathy Brienzo, informing Plaintiff that the monthly benefit would be a maximum of $879.58. Plaintiff claims that he did not receive the letter.

In 1992, Plaintiff received another personalized statement, this one stating that his monthly accrued benefit was $3,166.00. Plaintiff did not attempt to verify the accuracy of the 1992 statement. Plaintiff claims that no "Specific Plan Description" ("SPD"), outlining the plan benefits, was given to Plan participants at any time material to this case. A defense witness testified that the earliest he recalled there being an SPD was 1999: whether Plaintiff actually received the 1999 SPD is in dispute.

Plaintiff worked for Metz until August 1992, when Metz informed him that it was eliminating his position because it no longer required an operations manager. When Metz told Plaintiff about its decision to terminate his employment in August 1992, it offered Plaintiff a separation agreement which provided Plaintiff with certain severance benefits in exchange for a release of any claims that Plaintiff may have had against Metz. Plaintiff consulted his legal counsel, and then signed the agreement and returned it to Metz.

Plaintiff did not immediately re-enter the workforce after signing the separation agreement. He eventually accepted employment with Interstate Brands for three of the years after his termination from Metz, and received a total of $132,664 in salary over those three years.

After Plaintiff was terminated from Metz, Metz was acquired by company that also

owned Mother's.  The two plans were merged and became the Metz-Mother's Cake & Cookie

Co. Consolidated Pension Plan, effective as of December 31, 1995.  The two-step formula for

New Process employees remained in place.  The Metz component of the Metz-Mother's Plan was

restated as of January 1, 1999.  Again the two-step formula for New Process employees remained

in place.

     In or about 1998, it appears that a company called INVUS bought Metz and Mother's.

That company was sold to Specialty Foods Corporation.  Specialty then sold the Metz portion of

the company to Earthgrains.  The terms of the deal are contested.  Plaintiff claims that Specialty

sold pension liability for all Metz Plan beneficiaries to Earthgrains while Metz claims that

Specialty only sold the pension liability for those beneficiaries who were active employees of

Metz at the time of the sale.

     In August 2001, Plaintiff contacted Smith again.  He told Smith that he was turning 65 in

a few months and asked what he needed to do to apply for a pension benefit. Smith directed

Plaintiff to Rhonda Valdez-Chairez, an employee in the human resources department of Mother's

Cake & Cookie Co.  Valdez-Chairez eventually sent Plaintiff a payment options form that

showed a maximum monthly benefit of $969.61.[4]  Plaintiff again contacted Smith, who in turn

contacted Cathy Erpelding, one of the actuarial consultants working on the Plan.  Erpelding

explained to Smith that the formula for former New Process employees was not correctly applied

when creating Plaintiff's benefits statement estimate.  Plaintiff emailed Smith on October 10,

2001 and Smith responded that it appeared that the personalized statement had contained an

error.

---

[4]The Plan continues to contend that this is how much Plaintiff is owed.

6

Smith spoke about Plaintiff's claim with Daniel Keefe, a high ranking Mother's employee, several times. Keefe concluded that the amount of benefits identified on the 1991 and 1992 benefits statements sent to Plaintiff were incorrect.

Keefe then sent Plaintiff a denial letter. Plaintiff appealed the initial denial of his claim. Keefe denied Plaintiff's appeal. Plaintiff filed suit in this Court in December, 2002.

## STANDARD OF REVIEW

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Pro. 56(c); *see also Schmidt v. Ottawa Medical Center, P.C.*, 322 F.3d 461, 463 (7th Cir. 2003). When evaluating a motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party and makes all reasonable inferences in her favor. *See Haywood v. Lucent Technologies*, 323 F.3d 524, 529 (7th Cir. 2003).

It is the moving party's burden to demonstrate the absence of genuine issues of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir. 1995). If the moving party meets this burden, the non-moving party must set forth specific facts that demonstrate the existence of a genuine issue for trial. Rule 56(e); *Celotex*, 477 U.S. at 324.

## DISCUSSION

### *Count I*

Plaintiff brings Count I pursuant to §502(a)(1)(B) of ERISA, 29 U.S.C.§1132(a)(1)(B)

and includes the language of the section in his complaint: he states that he brings this action in order to "recover benefits due to him under the terms of the Plan, to enforce his rights under the terms of the Plan, and to clarify his rights to future benefits under the terms of the Plan." Plaintiff alleges that his claim for benefits and his subsequent appeal were not decided in conformance with the Plan's claim and appeal procedures. Plaintiff filed suit on this count against both the Plan and Metz as Administrator, but brings his summary judgment motion only as to the Plan. Metz and the Plan Defendants, in turn, both filed motions for summary judgment.

As a preliminary matter, Metz argues that it is not liable under Counts I and II because the company that purchased Metz from Specialty (the company that owned both Mother's and Metz) did not assume pension liability for employees like Plaintiff who were inactive Metz employees at the time of the sale. The facts support Metz's argument with respect to Count I: the sale agreement does indicate that Earthgrains only assumed responsibility for active Metz employees, at least for purposes of plan administration.[5]

Plaintiff makes much of the fact that the Earthgrains stock purchase agreement did not explicitly state that liability for inactive employees remained with Mother's. Plaintiff argues unconvincingly that Metz remained the administrator for the inactive Metz employees and that Keefe subsumed Metz's authority by taking over the Plan administration with respect to inactive employees.

The Seventh Circuit has held that an employer may be a proper defendant in an ERISA action when the employer and the Plan are intertwined. In *Mein v. Carus Corp.*, for example, the

---

[5]The agreement specifically refers to "individuals who are employed [by Metz]...as of the Closing Date."

Seventh Circuit determined that the plan and the employer were intertwined when throughout the plan description the close relationship between the plan and the corporation was evident, the corporation was the plan administrator and accepted service of process, and the vice president for the corporation used corporation stationary when writing letters for the plan. *See Mein v. Carus Corp.*, 241 F.3d 581, 585 (7th Cir. 2001).

This case, however, is sufficiently different from *Mein*. In this case, after the sale, both Metz and Mother's–as well as representatives from Mercer Consulting, hired by Mother's–proceeded to act as if Mother's had assumed responsibility for the inactive employees.[6] When Plaintiff submitted originally submitted his claim to Mother's, Mother's (through Dan Keefe, its agent) investigated the claim. Mother's then concluded that under the terms of the Plan, Plaintiff was not entitled to the level of benefits that he was requesting. Plaintiff has not established that there is evidence indicating Metz is a proper defendant as to Count I: the Earthgrains agreement specifically states that Metz retains liability only for active employees and both Metz and Mother's acted as though Metz did not retain liability as to inactive employees. Ideally, the Earthgrains agreement would have explicitly stated that Mother's retained responsibility for administering the pensions of inactive Metz employees. But the fact that this particular document did not is not enough to create an issue of material fact as to who assumed responsibility for the inactive Metz employees, given that all parties involved proceeded to act as if Mother's retained liability for inactive employees. Metz's motion for summary judgment as

---

[6] Perhaps most telling is a submission to the Court by Mother's and Plan Defendants noting that "Metz was sold and had no further responsibility to the Plan" as it pertained to inactive employees.

to Count I is GRANTED. [7]

The Plan also brings a summary judgment motion as to Count I, alleging that it is Plan Administrator and its benefit determination is entitled to review under an arbitrary and capricious standard. After the sale of Metz, Mother's became the default administrator pursuant to 29 U.S.C.A. § 1002(16)(A)(ii).[8] Plaintiff's argument that Keefe acted ultra vires, a renegade intent on masquerading as Plan Administrator, does not take the default provision into account. Keefe acted as an agent of Mother's, the employer that was the default Plan Administrator. Keefe testified at deposition that he was the highest ranking human resources professional within the Parmalat Bakery Group, which included Mother's. He also testified that he had the primary supervisory responsibility for the operation of Parmalat Bakery Group's employee benefit plans, including the Metz-Mother's Plan. He further testified that he had served as a trustee for pension plans in the past and had attended conferences on benefits plans.[9]

_____

[7] It remains unclear at this stage, based on the information before this Court, that the stock purchase agreement also covers the kind of conduct Metz is alleged to have committed in Count II: in this case, misrepresenting pension benefits to an employee so that he would willingly sign a severance agreement and leave the company. No party has briefed the issue. Summary judgment will not be granted with respect to Count II on the basis of the stock purchase agreement.

[8] Plaintiff has expressed concern about Mother's being considered the default Plan Administrator. The *Mein* opinion acknowledged that referring to the employer as plan administrator can see troubling at times. *Mein v. Carus Corporation*, 241 F.3d 581, 584 (7th Cir. 2001) ("What makes all of this doubly absurd as a matter of common sense, if not of law, is that, in this case, it is the corporation which is the plan administrator–which, though it sounds a little fishy, is legal. Unlike the common law of trusts, ERISA allows the employer to be the plan administrator. 29 USC §1002 (16)).) Moreover, Plaintiff's suggestion–that Metz remained the Plan Administrator for all employees–sounds more than a little fishy given that the conduct of the other parties indicates Metz was no longer in charge of administering the pension liabilities for inactive employees.

[9] At certain points of his deposition testimony, Keefe does appear to be saying that he administered the plan. Plaintiff does not rely on those statements. This Court also does not rely

Moreover, the facts in this case suggest that Keefe acted in the manner that an agent of a Plan Administrator would act. He was the person Mother's employees contacted regarding Plaintiff's claim. He was the person in charge of heading up the investigation of Plaintiff's claim. He was the person who eventually denied Plaintiff's claim and appeal. While it certainly would have been better practice for Mother's to reformulate its pension plan immediately after the sale of Metz, the facts in this case certainly suggest that Keefe was acting under authority granted to him by Mother's. Plaintiff offers no reason–and this Court is not in the position to conjure a reason–why Keefe was allowed to make the sorts of decisions he did if he was not acting as an agent of Mother's.

The parties agree that the terms of the plan give the administrator the discretionary authority to determine eligibility for benefits and construe the terms of the plan. Because the plan confers discretionary authority, this court must review the eventual decision in order to determine whether it was arbitrary and capricious. *See Hess v. Hartford Life & Acc. Ins. Co.,* 274 F.3d 456, 461 (7th Cir. 2001). "Under the arbitrary and capricious standard, a plan administrator's decision should not be overturned as long as (1) "it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome," (2) the decision "is based on a reasonable explanation of relevant plan documents," or (3) the administrator "has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem." *Id.* (citations omitted).

Keefe investigated Plaintiff's claim, and determined that Plaintiff's inclusion on Schedule

---

on those statements in the determination of who was the Plan Administrator under the law as it does not appear that Keefe was testifying that he was a Plan Administrator as such term is defined in the ERISA context.

A for pension benefits, which led to his being sent the 1991 and 1992 statements, was a mistake. He notes in his testimony that he reviewed documents, consulted with legal counsel, and spoke with Roger Smith when formulating his opinion.  Keefe eventually concluded that Plaintiff's benefits should have been determined according to the Plan's two-step formula of section 3.01(d) rather than the formula for New Process employees under section 3.01(e).  Keefe decided that Plaintiff was included on Schedule A because New Process managerial employees were typically included on Schedule A for privacy reasons, but that Plaintiff did not have a claim to the higher benefits offered to other, non-New Process employees on Schedule A.

Keefe was not bound to perpetuate what he viewed as the mistake of including Plaintiff in Schedule A by then granting Plaintiff the benefits guaranteed to other employees under Schedule A.  It was neither arbitrary nor capricious for Keefe to conclude that Plaintiff's inclusion on Schedule A was a mistake and that he would correct the mistake by placing Plaintiff in the correct category of claimants, which, according to the investigations, were the claimants who were granted benefits under 3.01(d).  The submissions to this Court indicate that Keefe thoroughly reviewed Plaintiff's claim and came to the not unreasonable conclusion that Plaintiff was not entitled to the higher level of benefits.  Given that Mother's treatment of Plaintiff's claim was neither arbitrary nor capricious, the motions for summary judgment filed by the Plan Defendants  is GRANTED as to Count I.  Plaintiff's motion for summary judgment is DENIED as to Count I.

*Count II*

Estoppel is an equitable doctrine that, if successfully applied, binds a party to the representations that it made to a party-opponent. The Seventh Circuit has held that "[e]stoppel

12

principles can be applied to certain ERISA actions." *Thomason v. Aetna Life Ins. Co.*, 9 F.3d 645, 650 (7th Cir. 1993); *see also Gallegos v. Mount Sinai Med. Ctr.*, 210 F.3d 803, 811 (7th Cir. 2000) (applying estoppel principles in ERISA case). The Seventh Circuit has approved of applying estoppel principles in ERISA cases "when countervailing ERISA principles would not be impeded and 'one party has made a misleading representation to another party and the other has reasonably relied to his detriment on that representation.'" *Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574, 586 (7th Cir. 2000) (quoting *Gallegos*, 210 F.3d at 811).

The Plan Defendants are correct in stating that current Seventh Circuit case law does suggest that not all equitable estoppel claims should be permitted to move forward in the multi-employer fully-funded pension plan context: the Seventh Circuit has expressed concern about allowing equitable estoppel claims to proceed when they "pose a risk to plans that rely on actuarial soundness." *See Coker v. Trans World Airlines*, 165 F.3d 579, 585 (7th Cir. 1999) (*citing Black v. TIC Investment Corp.*, 900 F.2d 112, 115 (7th Cir.1990)("The reason ordinarily cited for this reluctance [to apply estoppel in ERISA cases] . . . is a concern for the actuarial soundness of the ERISA plan.")).

It is unclear that concerns about actuarial soundness are at play in this case, which deals with a single-employer, defined benefit pension plan. The Plan Defendants have not offered evidence showing that the Metz-Mother's Plan specifically is actuarially unsound, nor have they offered evidence that Plaintiff's particular claim threatens the financial health of the plan. The Plan Defendants argue that a successful estoppel claim can impact the plan for many years, but do not apply that argument to this particular case where one claimant is seeking a discrete increase in benefits in accordance with the calculations that the actuaries themselves performed

and presumably took into account when determining how the Plan would be structured.

At this stage in the proceedings, there remain too many unanswered questions about the status of the Plan and how Plaintiff's claim could change that status for this Court to determine, as a matter of law, that Plaintiff may not bring an estoppel claim.

Moving on to the merits of the claim, four elements must be proven before equitable estoppel can apply: (1) a knowing misrepresentation by the defendants; (2) in writing; (3) with reasonable reliance by the plaintiff on the misrepresentation; and (4) to the plaintiff's detriment. *See Downs v. World Color Press*, 214 F.3d 802, 805 (7th Cir. 2000).

Plaintiff argues that he has proven all four elements and should be granted summary judgment in his favor. The Plan Defendants and Metz, on the other hand, argue that there was no knowing misrepresentation in this case and that Plaintiff's reliance was not reasonable. Additionally, the Plan Defendants argue that Plaintiff suffered no detriment. All Defendants argue that summary judgment should be granted in their favor.

The difference in opinion stems at least in part from the fact that the parties present very different stories of what actually happened in relation to Plaintiff's benefit statements. If Plaintiff is to be believed, "Mr. Smith, Metz, and the Plan always knew the truth about the discrepant level of benefits to which Mr. Kaliebe was entitled." Plaintiff seems to be arguing that Defendant Metz sent him the wrong statements, knowing they were wrong, so Plaintiff would agree to resign and sign a severance agreement. Plaintiff claims he was unaware of any discrepancy between the statements and what he was actually owed. Plaintiff claims Smith verified that the 1991 benefits statement was correct in a telephone call, the Plan did not provide him with documents labeled "Specific Plan Descriptions" that would have helped him verify

what he was owed under the Plan, and because the documentation he did receive from the Plan was confusing.

Defendants counter that the two statements were sent because of a clerical error that was not detected until Plaintiff actually attempted to claim his benefits. According to Defendants, it is unlikely that Plaintiff actually spoke with Smith, and offer deposition testimony from Smith indicating that he did not remember receiving an inquiry from Plaintiff regarding the 1991 benefit statement and that he would have taken at least two weeks to respond to such an inquiry if he had indeed received it.

A key part of this case focuses on whether there was a "knowing misrepresentation." Defendants argue that the amounts stated 1991 and 1992 statements resulted from simple clerical error–Plaintiff being listed in Schedule A of the Plan even though he should not have been–and use the deposition testimony of Smith to support the proposition that the misrepresentations were in fact mistakes that resulted from bureaucratic error rather than knowing misrepresentation. The Plan Defendants also argue that "no one knew in 1991 or 1992 that the benefits statements sent to Plaintiff contained an inaccurate benefits calculation."[10]

The Seventh Circuit has indicated that purely clerical errors–results of "bureaucratic sloppiness"–do not qualify as knowing misrepresentations. In *Coker*, for example, the plaintiff not only received prescription and insurance benefits cards, she also received free health insurance "for a substantially longer period of time" than she should have. *See Coker*, 165 F.3d at 586. The Seventh Circuit still refused to find a knowing misrepresentation, concluding that

---

[10] Defendants do not explain how this statement is to be reconciled with the argument that Plaintiff received a letter correcting the 1991 benefits statements.

there was "no hint" that the defendant intentionally set out to mislead plaintiff or anyone else and that at worst, the defendant was "guilty of bureaucratic sloppiness." *See id.* The Seventh Circuit reemphasized that a simple clerical error would not satisfy the knowing misrepresentation requirement in *Down*s. *See Downs,* 214 F.3d at 806.

Plaintiff, on the other hand, argues that the misinformation was not the result of bureaucratic sloppiness, but rather the kind of "repeated misinformation" that the Seventh Circuit has found gives rise to an estoppel claim. Plaintiff cites *Bowerman,* a case where the Seventh Circuit determined that "when an employer has provided 'repeated misinformation' to an ERISA claimant, and that misinformation prevented the claimant from making an election of benefits, estoppel should be applied to prevent the employer from denying those benefits to the claimant." *Bowerman,* 226 F.3d at 587 (7th Cir. 2000) (citing *Swaback v. American Info. Techs. Corp.,* 103 F.3d 535, 542–43 (7th Cir. 1996)).

While Plaintiff is correct that courts in this Circuit have occasionally found a knowing misrepresentation without explicitly determining that there was intentional misrepresentation, it is also clear that such a determination is very fact-specific. In *Bowerman,* for example, the Seventh Circuit spent a significant amount of time reviewing the undisputed actions taken by the parties–included futile attempts by the plaintiff to get the right information from her employer–before determining that the plaintiff was entitled to assert her estoppel claim. *See Bowerman,* 226 F.3d at 588-589.

Plaintiff cites *Spann v. Chicago Physicians II, P.C.* for the proposition that improper benefits statements give rise to misrepresentation claims. *See Spann v. Chicago Physicians II,*

*P.C.*, 2000 WL 263976 (N.D.Ill. February 28, 2000). *Spann,* in turn, relies on *Witowski v. Tetra Tech, Inc.*, 38 F.Supp.2d 640, 646 (N.D.Ill. November 13, 1998), for that proposition. *Witowski* deals with a situation where the plaintiff received an enrollment form, was sent a statement conforming her enrollment, paid premiums, and received benefits under a plan for which she was supposedly ineligible. The combination of false statements and other conduct gave rise to the possibility of false misrepresentation: far more occurred than the unwitting mailing of two incorrect statements. If Plaintiff is arguing that a knowing misrepresentation stems from the unwitting mailing of two incorrect statements, Plaintiff is incorrect.

The Plan Defendants add that the proposition that there was knowing misrepresentation in this case "defies common sense" because an employer would not knowingly overstate its employee's pension benefits. While this Court certainly does not presume that employers regularly overstate pension benefits, in this case Plaintiff does offer a tenable explanation for why in his particular case the employer may have knowingly overstated his benefits: he alleges that the employer, who wanted to terminate his position, may have inflated the benefits in order to get Plaintiff to agree to the severance agreement.

This Court simply does not have before it enough undisputed facts to determine if the misrepresentations were part of a generally disorganized and confusing scheme of "repeated misinformation" that led the Plaintiff astray, or simple bureaucratic errors that should not benefit plaintiff for equitable reasons.

The parties also disagree as to whether Plaintiff's reliance on the two statements, either alone or in conjunction with his reliance on the phone conversation with Smith, was reasonable.

Their disagreement is based in large part on a disagreement over material facts.

In their motion for summary judgment, Metz gives five reasons as to why the Plaintiff's reliance was unreasonable. First, Metz claims that Plaintiff should have known that Mercer had miscalculated his pension benefit because he was under the two-step New Process calculation formula rather than the one-step Heileman formula. Plaintiff contends he was not presented with sufficient instructions regarding either the application of the two-step or the functioning of the plan. Second, Metz claims that it was not reasonable for Plaintiff to rely on the 1991 and 1992 statements as an accurate and guaranteed statement of his future pension benefit, given that the statements were substantially higher than his previous statements and the letter he allegedly received in January 1992 from Metz showing that his pension benefit was lower than the amount in the 1991 statement. Plaintiff, however, claims that he never received the 1992 letter and that he did follow up on the 1991 statement by calling Smith. Third, Metz argues that it was unreasonable for Plaintiff to rely on an estimate as a promise of a benefit. Plaintiff counters that he was never given a Summary Plan Description ("SPD") in compliance with 29 U.S.C. §1022(b) and so had to rely on the estimate.

Fourth, Metz contends that Plaintiff did not speak with Smith after he received the 1991 statement and that even if he did, it should be considered an oral representation that modified the terms of the Plan. Whether Plaintiff spoke with Smith remains disputed, as does the nature of the conversation.[11] Fifth, Metz claims that Plaintiff's reliance was unreasonable because Plaintiff

---

[11] While Metz is correct that oral representations modifying the terms of the Plan will generally not be considered for the purposes of establishing estoppel, Plaintiff seems to be using his conversation with Smith as a means of indicating that he did verify that his statement was more than a mere clerical error.

"knew" that the former owner of New Process was upset with the amount of pension that he was getting. Plaintiff contends that he did not "know" that the owner was paid less, but rather had only heard that such was the case.

Plan Defendants argue that Plaintiff should have taken a more active role in confirming his benefits and suggest that he should have taken notes of his "alleged telephone call" with Smith. Plan Defendants argue that even if Plaintiff received two written statements and an oral confirmation of his benefits, his reliance was not reasonable. Defendants do not, however, provide case law indicating that ERISA beneficiaries have a duty to investigate the correctness of their pension benefits when they have three distinct representations that the benefits in question are correct, especially if, construing the facts in the light most favorable to Plaintiff, there was no other way for the Plaintiff to get the required information. Plaintiff counters that he did take sufficient action by confirming the spike in benefits with Roger Smith, the then-head of the Metz benefits department. Additionally, Plaintiff states that Defendants were in a superior position to investigate whether his benefits statement was correct and they did not do so.

Plaintiff and Plan Defendants also disagree as to whether Plaintiff suffered any detriment on the basis of his reliance. Plaintiff alleges that he did not actively seek employment that he otherwise would have sought if he did not have pension benefits available to him. Plan Defendants argue that Plaintiff's claim that he did not aggressively seek employment is "dubious" because Plaintiff was allegedly paid $132,664 over the course of three years after he was fired from Metz. The fact that Plaintiff was employed for three of the years following his termination from Metz does not necessarily mean that he was not detrimentally affected by the decision to deny him the benefits he expected to get. After all, if Plaintiff is to be believed, he

would have been actively seeking work for those years that he was unemployed..

As further evidence, Plaintiff also claims that he released certain discrimination claims arising from his employment because of his detrimental reliance on the promise of future benefits. In support, he references his administrative affidavit, submitted to Keefe, which states that he relied upon the 1991 and 1992 written statements when deciding to sign the Severance Agreement and release the company from any claims he may have had related to his employment or separation of employment "including, but not limited to any claims of unjust discharge or discrimination under any Federal, State or Local law, rule or regulation including the Age Discrimination in Employment Act." Plaintiff fails, however, to adequately allege that he was actually unjustly discharged or discriminated against. Given that Plaintiff and Defendants all filed motions for summary judgment, Plaintiff should have at least submitted some evidence stating with specificity what those claims that he released were: he fails to do so and therefore does not show detriment in relation to those claims.

Plaintiff and Defendants tell different stories at this stage of the proceedings. Given the number of material facts that remain in dispute, all motions for summary judgment as to Count II are DENIED.

**CONCLUSION**

For the reasons stated in this opinion, Defendant Metz's motion for summary judgment is GRANTED as to Count I and DENIED as to Count II. The Plan Defendants' motion for summary judgment is also GRANTED as to Count I and DENIED as to Count II. Plaintiff's motion for summary judgment is DENIED in its entirety. This case is set for status on April 12, 2005 at 9:30 a.m.

**Enter:**
**/s/ David H. Coar**
**David H. Coar**
**United States District Judge**

**Dated: March 28, 2005**